William Shearer
49746 I-415-T
Box 550
Gunnison, UT. 84634

1

## IN THE THIRD JUDICIAL DISTRICT COURT
## OF Utah, Salt Lake County

William Shearer, & family,
Plaintiffs,

v.

Utah Department of Corrections;
Mike Haddon, Director;
Shane Nelson, Warden CUKF;
Robert Powell, Warden U.S.P.;
John Does 1-20; mailroom staff;
Defendants: Sued in both
official & individual capacity.

> Application for Issuance
> of A Preliminary Injunction
> process, per U.R.C.P. 65A,
> and issuance of a Temporary
> Restraining order, without
> Notice. 65A-(b)(1);
> 42 U.S.C. §§ 1983, 1985
> and 1986, 29 U.S.C.§ 1132(a)(1)(B).

CASE: 249904453
Judge: McKelvie

A- Plaintiff hereby files this Motion for a Temporary Restraining order - Without Notice - and requests the beginning of process to issue A Preliminary Injunction, for cause shown herein: § 29 U.S.C. ¶132(a)(1)(B).

1- Pursuant to U.R.C.P. Rule 17(d) plaintiff hereby sues the State of Utah Actors in their official and individual capacities for violations of civil rights, and conspiring to deny rights, while acting, or standing idly and silently by, all the while acting - or omitting duty - under color of state law at all times herein, and henceforth: causing severe risk by ignoring Policy FD03.01, et seq. (see also 42 USC §§ 1983, 1985 & 1786.)

2- Under the "next friend doctrine" named Plaintiff is the father, brother, grandfather, uncle, cousin, or friend of all parties whose rights are protected under the U.S. and Utah State Constitutions under rights of association,

and/or right to life, liberty, or property thereafter under the First Amendment. (See also Article 1, Sections 1, 3, 7, 9) (See Declaration per 78-24-17+18 - pg. 12)

3 - There is a reasonable likelihood that Plaintiffs will prevail on the merits, as incoming mail contains both the names and addresses of Plaintiffs, and is irresponsibly handled by Defendants, contrary to established policy FD03/ that is intended to
"1 - further the legitimate interests of the DPO, while
2 - balancing the DPO's interests with those of the general public and inmates." FD03/02.01, B 1. & 2."
Those enumerated, and implicated interests here are: (All fall under FD03)

1.02 A. "DPO shall receive..";
B. "shall be designated as inmates Agents for mail";
F. "Personal or general mail ... shall be delivered on";
F.8. "shall be delivered to inmates without unreasonable delay".

FD03/04.06 B "If the envelope is not sufficiently complete, legible, or otherwise understandable, or there is no forwarding address available, the letter shall be returned to sender."

FD03/03.05 Procedures: Delivery to Inmates
C - "The housing unit mail handler shall:"
1 - "upon receipt of mail for inmates assigned to their units, prepare and have conspicuously posted a unit inmate mail list;"
3 - "ensure that mail is safeguarded until properly delivered...;"
5 - "[Do] not distribute mail to third parties (staff or inmates) to hold for, or deliver to

the inmate addressee, except as outlined in policy";

6- "Not leave in the inmate's assigned living quarters"; and,

7- "Not give inmate mail to housing unit staff" "and/or fellow officers for purposes of:"

"a. investigation;
 b- inspection for contraband;
 c- reading;
 d- witholding."

4- Subsection 4 (of FD 03/03.05 C was separated for emphasis here; it reads: "ENSURE THAT MAIL IS DELIVERED DIRECTLY TO THE INMATE ADDRESSEE;" (caps here represent bold print in policy)

B-    Cause of Action and Facts for Review:

1- Plaintiff has been incarcerated since May 23, 2000, and was placed in UDC facilities on May 25, 2000, and has resided at Utah State Prison, Draper until 2010; transferred to CUCF, Gunnison until February 2012; was transferred back to USP Draper until December 7, 2012; was removed to CUCF until June 27, 2013; was sent to Washington County / Purgatory Correctional Facility until August 13, 2013; was removed to CUCF Gunnison, and resides there still.

2- Plaintiff's family members have visited cumulatively over 350 times (having been denied any visits at Purgatory Facility for its duration), and have sent hundreds of letters to all facilities.

3- Since approximately 2008 one daughter by common law marriage and adoption was not allowed to send her mailing address into the prison - but she continued occasional visits. - Her mother prohibited the address from being placed on the envelope's return address area, or from being allowed possession through other family members - as was the mother's right; however, recent disclosures by a sister and another daughter (by different mother) informed of the real reason the address was prohibited. It is noteworthy that until approximately 2 years ago the disclosing daughter also withheld her address- though visiting occassionally throughout the entire timeframe - up to last month.

4- The reason for the stoppage was that an unauthorized inmate had sent letters to that address, and the mother became fearful that a grave risk had been orchestrated by plaintiff - as 97% of inmates (apparently) are released from prison - and she didn't want other inmates ~~from~~ knowing where they lived.

5- Plaintiff had not provided that address to any inmate, and still has not; despite numerous (almost every visit) requests from inmates in the visiting area that saw the visitors, and became enamoured with the female visitors. The family moved to remedy the threat.

6- Upon learning the factual basis of the address withholding, and understanding - and agreeing - with the motive to withhold it, plaintiff began a process of attempting to remedy the cause of the "breach of trust", because it was well known the address was NOT DISCLOSED by plaintiff.

7- Plaintiff inquired into the name of the inmate, but was told the letters were immediately discarded in the trash. This occurred approx 6 months ago.

8- Plaintiff slowly obtained information about how the mailroom actually works, through conversations dealing with legal mail issues arising in 2018 + 19 where CUCF Mailroom began opening legal mail envelopes in the mailroom and substituting a white envelope (after photocopying the manila or tan one the mail was sent in by the sender — even courts and attorneys — including the Attorney General — and even with privileged mail stamps or notation on the envelopes), which has still specifically occurred to legal mail (which is only authorized by policy to be opened in the presence of the inmate. FD 03/01.06 Inmate Mail Matrix.)

9- Plaintiff had NOT witnessed policy being followed (and has not) in CUCF at any time — No mail list was ever seen posted, and with the exception of legal mail, only non-mailroom officers passed out mail. Numerous times at Draper + CUCF officers put mail on the bunk, or under the door/inside the door while plaintiff was at work. At CUCF and Draper sites plaintiff has, with the exception of a few days following transfer, always maintained employment or volunteer employment jobs.

10- That places him off unit during the hours between 7:00am to 10:40am, and 11:45am to 3:45pm, and often from 5:00pm - 7:00pm; so mail was either passed out personally by the unit section officers, or left in, or on the cell floor or bunk

11- Following completion, in 2016, and transfer to in 2017, of the Ironwood "direct-supervision facility" at CUCF, mail was now delivered as follows:
   a) mailroom sorting and delivery to unit mail personnel;
   b) Unit mail officer delivered mail to one section officer (alternating) who sorted mail by section and delivered to other 3 section "direct-supervision" officers, who distributed mail.

12- The Section Officer, at his kiosk, or at a nearby table would then:
   a) call out inmates names, and place mail on the counter or the table; or
   b) call out names and hand the mail to the inmate, or
   c) leave the mail on the counter without calling out the names (which makes EVERY INMATE PASS BY THE COUNTER, VIEW EVERY piece of mail — every addressee or return address — to find out whether or not THEY HAVE MAIL), or
   d) after placing the mail on the counter and calling out names — AND NOT CALLING OUT NAMES — leaving the section with the mail unattended, or
   e) piling the mail up on the officers desk, where it can be seen by any inmate walking past the kiosk when leaving the section, for hours at a time, or
   f) call out an inmates name, and hand the mail to his cellmate to deliver.

13. Having witnessed, over 19 years of eroding protection of mail security, while policy became more mandatory with the wording "shall", that created only an illusion of propriety of mail delivery, and complied with the discovery of the breach of security (by an unauthorized inmates mailing to plaintiffs family). That caused plaintiffs rights of association, and perceptions of creating grave risk to his family, to be created (thus denying him the ability to maintain contact only through visits or third-hand mailings) by lapses in UDC policy application by Defendants and their staff (John Does) that allowed unauthorized access to families addresses by officers or inmates not allowed access by policy cited above, that created a grave risk of the wrong letter picked up by inmate — and taken.

14. On October 31, 2019, after another inmate told me I had mail — after sitting within 15' of the officer (Officer Hunt) for over 3 hours without any mail call occurring, and the mail being stacked on the officers kiosk-desk (not cameras), after he inquired if he had mail (having seen the mail on the top of the pile). I picked up my mail by approaching the officer and stating — "I was told I have mail.", and officer Hunt passing me 2 letters (one from the Utah Attorney General acknowledging service of a notice of claim for suit) (one from Dr. Donald Wright — co-founder of Prison Ed. Foundation with plaintiff) and after thanking the other inmate for telling me I had mail (and listening to him complain of how his recent mail had been delivered after lockdown, and some being sent back because it came in a blue envelope — WITHOUT A MAIL REFUSAL NOTICE per

8

FD03.103 policy.) It became obvious how the breach had occurred, and I approached Officer Hunt and enquired if he had read the "new mail policy" - The ensuing conversation was quickly turned into a confrontation by Officer Hunt, as he perceived I was "trying to tell (him) how to do my job!?! (Only possible because "on the job" for the state)

15- That confrontation led to Officer Hunt, and other Ironwood staff retaliating against me for asking for policy to be followed, by charging me with a B07 and a B14 violation based on misrepresentations of my reactions to Hunt's anger and aggression, and lies of fact in the disciplinary process. (currently on appeal to IDHO.) So now the violation of mail delivery under the First Amendment escalates to retaliatory actions to cover states failures of my rights, and my families rights to be secure, and associate freely. (4 video views requested)

16- Since October 31, 2019, Officers in Ironwood have made sure to Not only continue improper mail delivery, they have left ALL mail in Section 4 piled on the desk, or on the counter - without calling the inmate to get his mail for hours - if at all. Twice, 11-20 & 11-21 mail was not called out, nor delivered to the inmate. They had to go pick it up IF they went down to see if they had any; 11-20 is plain view (camera) This shocks the conscience & basic fairness mandates for public.

### Discussion of Claims:

1- There is a substantial probability, or a reasonable likelihood that plaintiff will prevail on the merits as follows; UDC duties ignored, willingly & intentionally by all 5

a) FD03/03 is being violated daily by Ironwood Staff, as outlined;

b) Plaintiffs family indisputably were threatened with potential, egregious risk, or harm, by policy being violated; which harm has caused substantial and extended harassment, paranoia, and mental and emotional stress along with causing a valid distrust of plaintiff to be acted upon; thereby limiting the family's desire to exercise their right to associate as a result.

c) Ironwood's current behaviors, as a result of being challenged on their policy violation, not only retaliated, but increased exponentially the possibility of other inmates obtaining personal contact with plaintiffs family when they have no valid right nor reason to do so, by making the mail addresses more easily accessible to all inmates in the section. This creates a threat of substantial harm and irreparable harm if the temporary injunction doesn't issue to stop this increasingly flagrant and intentional violation of policy stated; this shows reckless disregard, and gross negligence, and an egregious failure to protect plaintiffs rights.

d) The threat to plaintiff (retaliation from inmates seeking favored status from others) is substantial; BUT NOWHERE NEAR THE THREAT TO THE FAMILY UDC is exposing to attack or injury by soon-to-be-released inmates, or friends; also the threat of continued retaliation, for all inmates.

e) The public interest will not be disserved by

issuing a Temporary Restraining Order to flesh out the validity of these claims through evidentiary, testimony, and hearings to follow for issuance of a Temporary Injunction / Permanent Injunction against UOC officers and staff.

2. Any speedy remedy is impossible to obtain fast elsewhere, thus making resort to them inadequate to immediately correct or stop the potential risk and threat to plaintiff or his family. To the contrary, issuance of a Temporary Restraining Order will best serve the public interest in protecting the Constitutional rights of all its members.

Legal Authorities and Citations §§ 1983 & 1985, U.S.C.
(Utah Constitution Article 1, Sections 9, and 1, and 7.)

1. "Administrative Agency Required to follow their own regulations." Bar N K Ranches, v. Weatherg 994 F.2d 735 (10th Cir. 1993); These cases invoke Art. 1, Sec. 3 of Const., and Article V cl. 1 -U.S. Const.; "Federal law is supreme."

2. Clopper vs. Flynn, 605 F.2d 825 (10th Cir. 1979) "To deprive an inmate of his rights, or a recklessness in ignoring known threats or flagrant abuses or remarkably bad failure to protect as to shock the conscience of basic fairness is a violation of rights of the public. This qualifies as unnecessary rigor. (Art. 1, Sec. 9)

3. Wolford v. Lasater, 78 F.3d 484 (10th Cir. 1996);
"Government action which chills constitutionally protected speech or expression contravenes the First Amendment."

4. Hewitt v. Helms, 459 U.S. 460, 471-2, (1983),
"The application of the procedure, requiring that certain

procedures "shall" be employed."

5- <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. 922 (1982)(at 935); <u>U.S. v. Classic</u>, 313 U.S. 299 (1941),
"Misuse of power, possessed by virtue of state law and made available only because the wrongdoer is clothed with authority of state law, is action taken 'under color of state law'."

6- "Under the 14th Amendment, a protected interest must balance (1) The private interest affected by the official action; (2) the governmental interest, including the fiscal and administrative burdens created by additional procedural requirements, including the risk under current procedures." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 355 (1976)

7- Under the 8th Amendment ban on cruel and unusual punishment the court held that it must be shown that the defendants (state) displayed "Deliberate Indifference," "Gross Negligence", Reckless Disregard," or "Egregious failure to act" for plaintiff's safety." <u>Smith v. Wade</u>, 461 U.S. 30 (1983)

8- <u>Pell v. Procunier</u>, 417 U.S. 817 (1974) "prisoner retains 1st Amendment Rights that are not inconsistent with incarceration." (See also Art. 1, Sec. 9, Utah Constitution's ban on unnecessary rigor", and "cruel and unusual punishment)

9- See also <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974) "for due process in disciplinary processes that must represent mutual accommodation between constitution, prison needs, and penal objectives."

12

10. <u>Wood v. Strickland</u>, 420 U.S. 308, 321-22 (1975) "persons occupying "responsible public offices" are expected to have 'knowledge of the basic, unquestioned constitutional rights of their charges".

11. <u>Treff v. Galetka</u>, 74 F.3d 191 (10th Cir. 1996) "A refusal to process any mail for prisoners impermissibly interferes with the addressers 1st Amendment Rights."

12. Article VI, cl. 1, "State law notwithstanding — Federal law Supreme.

## Conclusion and Affidavit/Declaration

1. Since Defendants have acted as asserted here, Plaintiff, based upon this declaration under penalty of perjury and oath, of personal knowledge of facts discussed and known to be true, hereby requests this Court issue a Temporary Restraining Order, without notice, since the very recent changes in actual practice of Ironwood Officers and staff have shown a heightening threat to safety and security of Plaintiffs, both incarcerated, and free in society, requiring immediate relief, and beginning of process to correct the risks and threats occurring by such actions. (¶¶ 8-24, 17, & 18).

2. This Court should order all Defendants, their successors, agents, employers, and all persons acting within the scope of those concepts and duties, including those contracted to house inmates under County Jails, or UDC authorities, to refrain from improper mail handling, or deviating in any way from FD.03. et seq. in their handling of mail; and from creating such risk to the public through action or inaction.

3. The loss of familial trust, and resulting chill on maintaining proper interactions cannot be remedied, but, as far as possible, an order preventing further breach of the right to be safe and secure in family's home, caused by State governmental violations of their own rules and regulations, would go a long way to undo the injury sustained, as would compensation for the fear and uncertainty, emotional distress, and damage to family members feelings of security and safety caused by these wholly irresponsible, and retaliatory actions occurring only due to UDC's violation of their own policy.

Plaintiff fully intends to file suit for this breach, and for UDC's culture of treating inmates and their families as second-class citizens by denying them reasonable security and interaction as a family, by resulting consequences of failure to protect First Amendment Rights.

A temporary restraining order should issue to protect the public interests and plaintiff's interests, as civilly, and process to establish a Preliminary Injunction for 6 months, or conclusion of suit. Respectfully Submitted,

W# Shurath

11-23-2019

Service will be done if the court provides - this is the only copy. (It takes up to 2 weeks for copies, routing,)

Motion to proceed without
payment of fees & Affidavit

Plaintiff has $5.00 in his prison account, and will not be able to replace income loss for a period of 1 year due to a disciplinary charged and found guilty of that resulted as a consequence of emahanin fire asking Section 4 officer that "if [he] knew the new prison policy for mail delivery". A $20.00 fine and a total of 6 days (1 private write-up) punitive lockdown with 1 privilege level and 1 lockdown level drop also added as punishment. All for asking. I refused to obey policy FD03.03 etc.

Having been incarcerated for over 19 years — no other assets nor income is possessed.

I declare these facts to be true, under penalty of perjury, and ask the court to grant In Forma Pauperis standing for this action, and waive summons due to incarceration.

The lockdown time begins tomorrow so access to a notary will be denied until December 2nd or 3rd, 2017.

Respectfully Submitted

W. Flint H
49946